(C.D. 2214)

THE A. W. FENTON COMPANY, INC. v. UNITED STATES

United States Customs Court, Second Division

(Decided November 2, 1960)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* and *Paul J. Gavin* of counsel) ; *Black, McCuskey, Souers & Arbaugh* (*E. Robert Schellhase* of counsel) associate counsel ; for the plaintiff.

*George Cochran Doub*, Assistant Attorney General (*Henry J. O'Neill* and *Margaret M. Vallerie*, trial attorneys) ; for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: The importations to which this protest relates were invoiced as "Hoover Electric Motor and Gear Assemblies," hereinafter referred to as gear motors.

The collector of customs classified the importations as articles having as an essential feature an electrical element or device in paragraph 353 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 353), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, and duty was imposed thereon at the rate of 13¾ per centum ad valorem.

Plaintiff claims that the subject merchandise should be classified as motors of more than 1/10 horsepower but less than 200 horsepower in said paragraph 353, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, and dutiable at the rate of 11½ per centum ad valorem.

The pertinent text of the statutes above referred to is here set forth:

Paragraph 353, as modified by the Torquay protocol, *supra*:

Articles having as an essential feature an electrical element
  or device, such as electric motors, fans, locomotives, port-
  able tools, furnaces, heaters, ovens, ranges, washing ma-
  chines, refrigerators, and signs, finished or unfinished, wholly
  or in chief value of metal, and not specially provided for:
    Batteries                                                          * * *
  *          *          *          *          *          *          *
    Other * * * _____ 13¾% ad val.

Parts, finished or unfinished, wholly or in chief value of metal,
  not specially provided for, of articles provided for in any
  item 353 of this Part (not including X-ray tubes or parts
  thereof) _____ The same rate of
                                                              duty as the ar-
                                                              ticles of which
                                                              they are parts

Paragraph 353, as modified by the Sixth protocol of supplementary concessions, *supra:*

Articles having as an essential feature an electrical element or device, such as
  electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens,
  ranges, washing machines, refrigerators, and signs, finished or unfinished,
  wholly or in chief value of metal, and not specially provided for:
  *          *          *          *          *          *          *
    Motors:
      Of more than 1/10 horsepower but less than 200 horse-
        power_____ 11½% ad val.
      Other * * *        .
  *          *          *          *          *          *          *

Parts, finished or unfinished, wholly or in chief value of metal, not specially provided for, of articles provided for in any item 353 in this Part:

Parts of motors_____ 11½% ad val.

\*       \*       \*       \*       \*       \*       \*

Other_____ The same rate of duty as the articles of which they are parts.

At the trial, the following two witnesses were called, both of whom testified on behalf of plaintiff: Dr. Pierce Daiger, vice president in charge of engineering for the Hoover Co., and Donald Lindsey Boyd, a consulting engineer and manufacturer's representative. Both witnesses were highly qualified and well informed upon the subject matter of this controversy.

Dr. Daiger testified that he was a doctor of engineering and vice president of the Hoover Co. (the real importer herein), with whom he had been associated for 27 years.

The witness, Boyd, a consulting engineer and holder of a master's degree in electrical engineering from Iowa State College, based his testimony upon 37 years' experience with electrical motors.

During the progress of the trial, the following exhibits were introduced by plaintiff and received in evidence:

Exhibit 1—sample of gear motors in controversy.

Illustrative exhibit 2—Hoover floor polisher in which a gear motor, such as exhibit 1, is an integral part.

Illustrative exhibit 3—a gear motor, such as exhibit 1, in a knocked-down condition.

Exhibit 3-A—the "armature" and "field" of exhibit 3.

Illustrative exhibit 4—photostats of two pages from a publication issued by the National Electrical Manufacturers Association, containing definitions of various types of motors.

Illustrative exhibit 5—Six photostats of pages from a publication issued by the American Standard Association, also containing definitions of various types of motors.

From the testimony of the witnesses, Daiger and Boyd, the following facts were established:

The importations in controversy, which were produced in England, are "special-purpose," "universal," and "gear" electric motors which were designed for use in floor polishers of the household type.

The designation "special-purpose" implies that the motors are designed for a particular job; they are "universal" because they operate on alternating or direct current; and "gear" in that the power take-off is through built-in gears. An electric gear motor is composed of a worm and rotating armature, drive shafts, gears, electric wire,

field coil, bearings, carbon brushes attached to the rotating armature, and a 2-piece die casting frame.

A special-purpose motor differs from a general-purpose motor in that the latter is designed for a wide range of purposes and for general application without specific electrical or mechanical characteristics. Definitions of the special-purpose motors, general-purpose motors, and universal motors are set forth in exhibits 4 and 5.

A physical examination of exhibit 1 reveals a very compact, composite structure of closely integrated parts designed for economical use in domestic floor polishers. The frame of the motor also serves as a housing for other parts of the unit. As stated by Dr. Daiger, "you have no motor until the mechanical frame holds the electrical parts together." He described other uses for the special-purpose gear motors in portable handtools, and other electrical tools, portable and standard food mixers, all types of clocks, reciprocating fans, and other appliances. It would not be practical or economical to attempt to use a motor without a gear in a domestic floor polisher. The purpose of the gear is to properly utilize and transform electrical energy into mechanical energy at the desired speed and required torque of the polishing brushes.

In response to a question from the court, Dr. Daiger stated that there was no known use for a motor such as exhibit 1 without a gear assembly. "There is no way to get the power out of it without the gears." The witness, Boyd, corroborated that statement. It was also stated that the motor and gear assembly was designed, purchased, and used as an entirety.

It is not disputed that the article in controversy is more than $\frac{1}{10}$ horsepower and less than 200 horsepower.

When asked to explain how the electrical energy in exhibit 1 is transformed into mechanical energy, Dr. Daiger stated:

* * * the electric current passes through the field coil on the stationary part of the motor. That sets up the magnetic field. The same electric current is led into the rotating armature and goes through conductors in the armature. Motion is generated in the armature with the magnetic field which in turn rotates the shaft of the armature. The shaft of the armature has a worm gear that drives a spur gear which in turn drives the shaft, the two shafts where you get the power of this device.

Based upon the uncontradicted testimony of two very competent and intelligent witnesses and from a physical examination of exhibit 1, we entertain no doubt that the article is, in fact, a motor which may well be described as a gear motor or special-purpose motor, and that it is a motor of more than $\frac{1}{10}$ horsepower and less than 200 horsepower of the kind described in paragraph 353, as modified, *supra*. That the

article is a single unit is further indicated by the fact that it was invoiced, entered, appraised, and classified for duty as an entirety.

An examination of the pertinent statutes discloses that when paragraph 353 was modified by the sixth protocol, *supra*, the negotiators gave special consideration to motors, providing that motors of more than 1/10 horsepower but less than 200 horsepower should be dutiable at the rate of 11½ per centum ad valorem. "Other" motors were provided for at the rate of 12½ per centum ad valorem. Furthermore, the negotiators also provided that parts of motors should be dutiable at the rate of 11½ per centum ad valorem, while "Other" parts of electrical articles in said paragraph 353 shall pay "The same rate of duty as the articles of which they are parts."

It logically follows, therefore, that if the imported articles are motors, as entireties, of more than 1/10 horsepower but less than 200 horsepower—and we so hold, they are dutiable at the rate claimed by plaintiff.

If it were not for the specific provision for motors in paragraph 353, as modified, *supra*, it might reasonably be argued that these gear motors should be classified as parts of articles having as an essential feature an electrical element or device, inasmuch as floor polishers of the household type have been held to be properly classifiable in paragraph 353, as modified, *supra*, as articles having as an essential feature an electrical element or device. *United States* v. *Electrolux Corporation*, 46 C.C.P.A. (Customs) 143, C.A.D. 718.

Paragraph 353 in addition provides that the same rate of duty applicable to the articles shall be applied to parts thereof which are "not specially provided for." However, as pointed out above, motors of more than 1/10 horsepower but less than 200 horsepower are specially provided for and, consequently, are dutiable at the rate provided for them in paragraph 353, as modified by the sixth protocol, *supra*.

We have examined the various authorities cited by counsel in their briefs but find it unnecessary to discuss them here.

Based upon the record and for the reasons stated, we find and hold that the subject merchandise consists of motors of more than 1/10 horsepower but less than 200 horsepower of the kind described in paragraph 353, as modified by the sixth protocol, *supra*, and properly dutiable at the rate of 11½ per centum ad valorem, as claimed by plaintiff.

The protest is sustained to the extent indicated and judgment will issue accordingly.